IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 11, 2015 Session

## JOSEPH DEJUAN WEBSTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-B-1384    Steve Dozier, Judge**

_____

**No. M2014-02508-CCA-R3-ECN – Filed November 30, 2015**

_____

A Davidson County jury convicted the Petitioner, Joseph Dejuan Webster, of first degree premeditated murder, and the trial court sentenced him to life in prison. The Petitioner appealed, arguing that there was newly discovered evidence. This Court affirmed the Petitioner's conviction. *State v. Joseph Dejuan Webster*, No M2007-00050-CCA-R3-CD, 2008 WL 2229208, at *1 (Tenn. Crim. App., at Nashville, May 29, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008). In May 2014, the Petitioner filed a petition for writ of error coram nobis, alleging that one of the key witnesses against him at trial had recanted her trial testimony in a sworn statement. The coram nobis court held a hearing, and, after expressing doubt as to the witness's testimony, dismissed the petition for writ of error coram nobis. On appeal, the Petitioner contends that the coram nobis court erred and asserts that he is entitled to coram nobis relief on the basis of the witness's recanted testimony. After a thorough review of the record and applicable authority, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ. joined.

Jeffrey O. Powell, Goodlettsville, Tennessee, for the appellant, Joseph Dejuan Webster.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

The Petitioner was indicted in April 2005 for the first degree premeditated murder of Leroy Owens that occurred on November 22, 1998. At trial, the following testimony led to the Petitioner's conviction:

*Factual Background*

In April of 2005, [the Petitioner] was indicted for the first degree murder of Leroy Owens that occurred on November 22, 1998. At trial, Tammy Nelson testified that she was living in an apartment complex at 159 Hermitage Avenue in November of 1998. She and Leroy Owens, the victim, were friends. She knew the victim as "Little Nick," and he would sometimes stay at her apartment. Ms. Nelson and the victim had used drugs together in the past.

According to Ms. Nelson, around the beginning of November, a man named Robert Nichols, who was known as "Big Nick," wanted "some dope." The victim offered to call his "cousin" who had some "good stuff." Two men, one of whom was [the Petitioner], arrived at Ms. Nelson's apartment. The men claimed that the victim already owed them some money. The victim and "Big Nick" pooled their money together and "got the drugs" from the two men. The men left the apartment. Ms. Nelson was under the impression that the victim and "Big Nick" were going to divide the drugs up for resale to make some money, but "Big Nick scammed Little Nick out of his money."

About three days later, [the Petitioner] and the other man that brought the drugs, returned to Ms. Nelson's apartment, looking for the victim. Ms. Nelson specifically identified [the Petitioner] as one of the men that came to her door. The men came to her apartment five or six times looking for the victim. At some point, the two men gave Ms. Nelson a pager number and told her to call them when she saw the victim. On November 21, 1998, the victim came to her house. The victim and Ms. Nelson got high together, and the victim stayed the night at her apartment. Ms. Nelson called the pager number to let the men know that the victim was at her apartment. The two men arrived at Ms. Nelson's apartment in a white station wagon on the morning of November 22, 1998. When they arrived, the victim was asleep. Ms. Nelson woke the victim up to tell him that [the Petitioner] and the other man were there to see him. [The Petitioner] went to the car where Ms. Nelson saw him put on gloves and get a stick. The other man "snatched" the victim out of the front door of Ms. Nelson's apartment. Ms. Nelson saw [the Petitioner] start hitting the victim with his hands. The victim took off running, escaping over a fence. As he was running away, one of his black tennis shoes came off his foot. [The

2

Petitioner] and the other man got into their car to chase the victim. About thirty minutes later, Ms. Nelson learned that the victim was dead.

The victim ran to Delunn Todd Hyde's house. According to Mr. Hyde, the victim entered his house without being invited inside. The victim looked like he had been beaten up, was missing a shoe and had bruises under his eye. The victim's pants were "halfway down." The victim acted "scared" and asked to use Mr. Hyde's telephone. Mr. Hyde did not want to get involved, so he escorted the victim out of his house. The victim asked Mr. Hyde to look outside to see if there was a white car. Mr. Hyde reported that he did not see a white car. At that point, the victim "took out across the street running." Mr. Hyde then saw a white "souped up" station wagon coming over the hill toward the victim. The car "flew right behind" the victim. Mr. Hyde could tell that there were two black men in the car and remembered that he had seen the same car the night before on Lewis Street. About thirty minutes after the victim left his house, Mr. Hyde walked to the scene of the incident and learned that the victim was dead.

Fred McClain testified that on November 22, 1998, he was "doing some concrete" work for a small restaurant on the corner of Green Street and Wharf Avenue.[1] Around 11:30 a.m., Mr. McClain heard a car pull up and brakes "screeching." The next thing he saw was a "man running." The man running turned out to be the victim, Leroy Owens. He also saw a "white car that pulled up, that the two fellows jumped out of." The two men were black and one of the men was about five feet nine inches tall and weighed about two hundred and twenty-five or two hundred and thirty pounds. The other man was smaller, "about five eight and weighed about one seventy-five." The car was an older white station wagon with "chrome wheels."

The two black men from the car "bum rushed" or "tackled" the victim while he was running. This caused the victim to actually bump into Mr. McClain, who hit his head on the food service window of the restaurant. Mr. McClain got up and ran around a corner to the side of the building. When he peered around the corner, he saw the larger of the two men standing over the victim, who was lying on the ground. The larger man was hitting the victim with a cinder block. Mr. McClain heard the man ask, "Where's my goddamn money?" Mr. McClain saw the man hit the victim twice with the cinder block before the two men left in the station wagon. Once the two men left, Mr. McClain could see blood running out of the victim's head where he had been hit with the block. The victim was silent and still. Mr. McClain was unable to identify the attackers.

3

Officer James Jordan of the Metropolitan Nashville Police Department responded to a call at 11:33 a.m. on November 22, 1998, reporting the beating of the victim. When he arrived on the scene, Officer Scott Baswell was already present. The victim was lying on the ground in a large pool of blood. The victim's skull was exposed, and there was a large cinder block lying next to the body within a foot of the victim's head.

Detective Brad Corcoran and Detective Pat Postiglione investigated the murder of the victim. Around 7:00 p.m. on the day of the murder, Detective Corcoran and Detective Postiglione went to 1245 Lewis Street and spoke with a woman named Katrina Norman. At the time, Ms. Norman was [the Petitioner's] girlfriend. At the time of trial, she was married to [the Petitioner] and went by the name Katrina Webster.[2] Detective Corcoran informed Ms. Norman that he was trying to locate [the Petitioner] and the white station wagon that had been described by several witnesses. Ms. Norman told Detective Postiglione that she knew the owner and driver of the car but refused to identify them. Ms. Norman, who had [the Petitioner's] first name, "Joseph," tattooed on her neck, was uncooperative and actually became "very defensive" during questioning. At trial, Ms. Norman testified that she did not know anything about the victim's murder. She also denied that she told the police she knew the owner and driver of the white station wagon.

Detective Postiglione was the first person to interview Ms. Nelson. She initially denied knowing the victim but later explained what occurred on the day of his murder. Ms. Nelson identified [the Petitioner] from a photographic lineup. She also identified [the Petitioner] at trial. According to Detective Postiglione, Ms. Nelson was "fearful," "upset and crying."

At trial, Dr. Feag Lindthp, an assistant medical examiner, testified that the victim sustained multiple blunt force injuries to the head that resulted in several abrasions and lacerations. The victim also had multiple skull fractures and hematoma. There was hemorrhaging of the brain stem, and the victim's brain itself was bruised in several places. In Dr. Lindthp's opinion, the victim's death was caused by multiple blunt force injuries to the head.

[The Petitioner] took the stand in his own behalf. He claimed that he did not remember what he did on November 22, 1998. [The Petitioner] denied ever owning a white station wagon. Further, [the Petitioner] claimed that he did not know Tammy Nelson. [The Petitioner] stated that he was dating Ms. Norman at the time of the incident and that she lived on Lewis Street.

4

At the conclusion of the trial, the jury found [the Petitioner] guilty of first degree premeditated murder. The trial court sentenced [the Petitioner] to life in prison, to be served consecutively to the sentences [the Petitioner] was already serving for felony drug charges. [The Petitioner] filed a motion for new trial in which he argued that he had "obtained newly discovered evidence that was not available to counsel at the time of trial." Attached to the motion were affidavits from Marie Burns, [the Petitioner's] mother; Katrina Norman, [the Petitioner's] wife; and Arthur Gordon, [the Petitioner's] brother. The affidavits alleged that [the Petitioner's] brother, Kenneth Neal, was the owner of the white station wagon and was the perpetrator who killed the victim. [The Petitioner] later filed an amended motion for new trial in which he raised additional grounds for relief.

The trial court held a hearing on the motion for new trial. At that hearing, several witnesses took the stand, including: Marie Burns, [the Petitioner's] mother; Arthur Gordon, [the Petitioner's] brother; Katrina Norman, [the Petitioner's] wife; Kenneth Neal, [the Petitioner's] brother; Phillip Cotton, a friend of Mr. Neal; and [the Petitioner].

Marie Burns testified that her son Kenneth Neal was the owner of the white station wagon. Ms. Burns admitted that she was questioned in 1998 by Detective Postiglione about the white station wagon. She claimed that Detective Postiglione never asked if [the Petitioner] owned the white station wagon. She did not tell the detective that Mr. Neal was the owner of the car. Ms. Burns claimed that [the Petitioner] told her prior to being arrested for the victim's murder that Mr. Neal "went out south and killed that man," but that she never told anyone about it because [the Petitioner] told her he "didn't want to see [her and Petitioner's wife] hurt." According to Ms. Burns, she approached counsel for [the Petitioner] immediately after trial and told her that Mr. Neal killed the victim. In fact, Ms. Burns claimed that Mr. Neal admitted to the murder.[3] Ms. Burns stated that she had a conversation with Mr. Neal prior to [the Petitioner's] trial in which Mr. Neal told her that the jury would not convict [the Petitioner] of the crime because he and [the Petitioner] "don't look alike" and that he was the one that "did it." Ms. Burns was afraid to tell anyone, but thought that after [the Petitioner] was convicted, it was time to come forward with the information.

Arthur Gordon testified that his brother, Mr. Neal, told him that he committed the murder that [the Petitioner] was convicted of committing, but he could not remember when that conversation occurred. On cross-examination, Mr. Gordon stated that the conversation may have occurred

about "three weeks" after the murder. Mr. Gordon also informed the court that Mr. Neal owned a white station wagon in 1998. Mr. Gordon testified that Mr. Neal told him that the car was taken to Kentucky and "destroyed."

Katrina Norman Webster testified at the hearing on the motion for new trial. She claimed that she knew that Mr. Neal committed the murder in 1998, but did not tell anyone about it because she was scared of Mr. Neal. She decided to come forward with the information after trial because her husband was convicted for a crime that he did not commit.

Kenneth Neal denied that he owned a white station wagon in 1998. He admitted that Ms. Burns questioned him about the murder but claimed that he walked out the door instead of talking to her about the murder. When asked why he did not specifically deny committing the murder, Mr. Neal responded, "I didn't have a reason to say anything about it."

At the conclusion of the hearing, the trial court took the matter under advisement. In a written order, the trial court denied the motion for new trial, determining:

> The proof . . . showed that the [the Petitioner], his mother, his wife and his other brother all knew about the alleged confession *before* the trial. However, they all chose to not inform the [the Petitioner's] lawyer about this potential piece of evidence. The timing of the entire family revelation causes the Court great concern about the legitimacy of the information. There has been no proof to indicate that the [the Petitioner] attempted to procure Kenneth Neal's presence at trial and the Court finds the allegations raised at this late date unbelievable. Therefore, the [the Petitioner] did not exercise reasonable diligence in searching for the evidence prior to trial as he knew about the evidence prior to trial and made no efforts to have Kenneth Neal available to testify at trial. This quite simply is not newly discovered evidence. Therefore, this issue is without merit.

*State v. Joseph Dejuan Webster*, No. M2007-00050-CCA-R3-CD, 2008 WL 2229208, at *1-4 (Tenn. Crim. App., at Nashville, May 29, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008).

## B. Post-Conviction

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel. One of the numerous alleged deficiencies was that Counsel failed to properly cross-examine the State's witnesses, specifically Ms. Nelson. *Joseph Dejuan Webster v. State*, No. M2009-01540-CCA-R3-PC, 2010 WL 2594028, at *4 (Tenn. Crim. App., at Nashville, June 28, 2010), *perm. app. denied* (Tenn. Nov. 10, 2010).

About the issue relevant to this appeal, this Court concluded:

> First, [the] Petitioner argues that trial counsel failed to properly cross-examine Ms. Nelson regarding her identification of [the] Petitioner as the perpetrator and an alleged inconsistent statement. At the post-conviction hearing, trial counsel testified that he was surprised that Ms. Nelson was such a good witness for the State. He expressed frustration by the fact that she was "[sticking] to her guns" during her testimony. Trial counsel did not recall specific things about which he cross-examined Ms. Nelson at trial but explained that he did not feel like he was "getting anywhere" because she was such a "good witness" so his strategy was to "back off." The post-conviction court accredited the testimony of trial counsel. The record supports the post-conviction court's determination. [The] Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

*Id.* at *7. This Court affirmed the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief. *Id.*

## C. Error Coram Nobis

The Petitioner then filed a petition for writ of error coram nobis. In the petition, he alleged that Ms. Nelson had recanted her trial testimony in a sworn statement that was attached to his petition. He asserted that had Ms. Nelson's recantation been presented to the jury it may have led the jury to a different verdict. The Petitioner asked that, on this basis, the coram nobis court vacate his conviction and award him a new trial.

The coram nobis court held a hearing, during which the following evidence was presented: Ms. Nelson testified that she testified for the prosecution in the Petitioner's case. She said that she testified that the Petitioner was a "suspect" in the victim's murder. Ms. Nelson said that she had, at the time, thought that the Petitioner had "did the killing" but that he was not guilty of this crime.

Ms. Nelson said that she understood that she would not get favorable treatment for testifying at the Petitioner's trial, but she maintained that she offered her testimony while

unsure whether it was the Petitioner who had come to her home. She said that, after she saw the pictures of the Petitioner's brother, she realized that she was mistaken and felt she had to make it right. Ms. Nelson said that she had come forward to clear her conscience.

Ms. Nelson testified that she did not read the statement recanting her trial testimony prepared by the Petitioner's counsel and signed by her. She agreed that her signed statement contained assertions that the assistant district attorney had offered her a "deal" but that assertion was untrue. She said that the family must have been mistaken because she had never mentioned the assistant district attorney by name. Ms. Nelson said that she signed "the one paper saying one thing and I just signed all the rest of the papers not reading them."

Ms. Nelson testified that the Petitioner's current counsel got involved in the case after her statement had been filed. He called her and reviewed the statement with her. When he did, she was adamant that the assistant district attorney never offered her a deal, and Ms. Nelson expressed concern about being charged with perjury.

Ms. Nelson discussed the parts of her signed statement that were true. She said that it was true that she never saw the Petitioner harm anyone. Ms. Nelson confirmed that no one had offered her anything for her testimony at the hearing.

During cross-examination, Ms. Nelson testified that she only remembered parts of her trial testimony. She said that she recalled that she was incarcerated at the time, but she did not remember who the presiding judge was, what building she testified in, or whether the prosecutor was a man or a woman. Ms. Nelson agreed that she was not on drugs at the time of her trial testimony and that it had been "a while" since she had used drugs. Ms. Nelson said that, at trial, she told what she thought was the truth but that she was unsure at the time of trial. She further said that when she first spoke with detectives after the homicide, she told detectives what she thought was the truth.

Ms. Nelson said that she first met with the Petitioner's mother in July 2014. She explained that the Petitioner's mother's other son, Arthur Gordon, was long-time friends with a man whom she had also known for "years." Mr. Gordon came to her home with their mutual friend, told her his identity, and informed her that his mother wanted to speak with her. Ms. Nelson got into the car with Mr. Gordon and her friend and went to the Petitioner's mother's house. When she got there, Mr. Gordon and her friend waited outside while she went inside with the Petitioner's mother, whom she referred to as "Ms. Marie."

Ms. Nelson said that Ms. Marie asked her if she knew the Petitioner, and Ms. Nelson told her that she had never really known the Petitioner. Ms. Marie then showed Ms. Nelson a picture that showed Ms. Marie's other son Arthur Gordon, and Ms. Nelson

8

began crying because it "clicked" and "came back" and she realized that she had "picked out the wrong person." She and Ms. Marie immediately went to a notary and created a statement. The statement showed a date of February 7, 2014.

Ms. Nelson agreed that, during the time between her release from prison and when Ms. Marie showed her this picture, she had had periods of sobriety and periods of relapse. She used both marijuana and crack cocaine. Ms. Nelson said that she had difficulty remembering the specific time periods that she was using drugs. She said she had no memory of meeting with the assistant district attorney for two hours before trial.

Ms. Nelson testified that the statement that she gave the notary at the funeral home was "nothing like" the statement that she had signed. She said that she trusted the Petitioner's family by thinking that the document that she had signed accurately reflected what she had stated to the notary. Ms. Nelson described giving the notary her statement, saying that she went to the funeral home, and the notary had a pen and was writing down what Ms. Nelson said. The notary went into a different room and typed up what she had written. She then returned to Ms. Nelson and had her sign a document three pages long. Ms. Nelson said that she did not read the document but just signed it. Ms. Nelson said that she signed each of the three papers, and she thought that she was signing the same document three times. She did not notice that her name was misspelled on the document.

Going over her statement, Ms. Nelson testified that the statement falsely alleged that the assistant district attorney took advantage of her addiction and her desire to get out of jail and offered her a deal to testify against the Petitioner. It also falsely stated that she was granted drug court instead of prison in exchange for her testimony and that, upon completion of drug court, she was "returned to the streets." The statement falsely asserted that Ms. Nelson had been "haunted" since agreeing to this deal. Ms. Nelson clarified that there was never any deal and stated that, in fact, she had never met the assistant district attorney prosecuting the Petitioner.

Ms. Nelson testified that she had participated in drug court but that it was before the Petitioner had been indicted for this murder, and the agreement involving drug court had nothing to do with her testifying in any case.

Ms. Nelson said that she could not say whether her memory of the situation surrounding the murder was better closer to the time that the murder occurred or during her testimony at the hearing. She said that she was certain that the two men involved in the murder came to her home twice. Ms. Nelson did not recall telling the police or the jury that the men had come to her home six or seven times. When the State's attorney pointed out that the men had to have come to her home at least a third time, when they gave her the paper with their number for her to call if she saw the victim, she said that she never paged them. When confronted with her trial testimony, she said that she could not

9

remember if she paged them or if she put in 1111 into the pager to indicate that he was present at the apartment.

Ms. Nelson said that, before she testified at trial, someone came to her home and threatened her, telling her to "keep [her] mouth closed." Her home was also vandalized on a separate occasion.

During redirect examination, Ms. Nelson testified that she did not know who had vandalized her home and that she did not know whether it was a member of the Petitioner's family.

Detective Pat Postiglione, who was the lead investigator in this murder case for the Metropolitan Nashville Police Department, testified that he interviewed Ms. Nelson the day after the murder had occurred. He said that Ms. Nelson described two individuals to him that she thought might be involved in the murder. She said that one of those individuals was heavier than the other and that he was a black man. Ms. Nelson told the detective that one of the men was called "Joseph" and had a nickname, "Big Boy." Ms. Nelson gave him a description of the vehicle that the two men had arrived and left in. This description matched a description of another witness, Mr. Hyde, who had seen the vehicle at the scene of the murder.

Detective Postgilione testified that Mr. Hyde said that he had seen the vehicle parked nearby the night before. When the detective went to that home, he spoke with the Petitioner's girlfriend, Ms. Norman, who was not cooperative. The detective noticed that Ms. Norman had the Petitioner's name, "Joseph," tattooed to her neck. He also discovered that she had been given a traffic citation in a vehicle registered to the Petitioner.

Detective Postgilione said that he showed Ms. Nelson a photographic lineup within twenty-four hours of the murder. He said that he followed standard procedures when he showed her the lineup and that she identified the Petitioner. The detective had three follow-up interviews with Ms. Nelson in the years before the Petitioner's trial, and, at each, she confirmed her identification of the Petitioner. Detective Postgilione testified that Ms. Nelson told him that the two men had been to her home on multiple occasions and that, on the day of the murder, she woke up the victim to tell him that the two men were at the home. The victim went outside, and the assault started. The detective described Ms. Nelson as "coherent" and said that she did not appear to be under the influence of drugs when he spoke with her.

Detective Postgilione testified that, according to police records, the Petitioner was 5'10" and weighed 300 pounds. The Petitioner's brother was 5'10" and weighed 190 pounds. The photographs of the Petitioner's brother showed that he had facial hair while the Petitioner did not.

The State entered into evidence the audio recording of Detective Postgilione's interview of Ms. Nelson in 1999. The recording corroborated that Ms. Nelson picked the Petitioner out of the photographic lineup. In the recording, Ms. Nelson also mentions the names "Joseph" and "Big [B]oy" as being one of the two men who were at her home. The detective said that when he first interviewed Ms. Nelson she did not have the same "difficulties" recalling the events surrounding the murder that she seemed to have during the hearing.

During cross-examination, Detective Postgilione testified that he had independently confirmed that the Petitioner's nickname was "Big Boy." He said, however, that the other police officers who had confirmed this for him did not testify at trial. The detective testified that he did not know the identity of the registered owner of the white vehicle that was involved in the murder. He said that the Petitioner's mother confirmed that the Petitioner drove a white station wagon, but the detective could not prove that the Petitioner was the owner of the vehicle. The detective agreed that the Petitioner's mother gave trial testimony that differed from what she had told him during his interview of her.

Detective Postgilione testified that the Petitioner's mother had repeatedly made complaints against the police department, saying that the detective had made up the information about the white station wagon. The Petitioner's mother had also testified at his motion for new trial that she intentionally did not tell police that her other son had committed the murder.

Based upon this evidence and the arguments of counsel, the coram nobis court took the matter under advisement. In a subsequent written order, the coram nobis court made the following findings:

> The Petitioner was convicted following a jury trial of one count of first degree murder. The Court sentenced the [D]efendant to life imprisonment and that sentence was ordered to be served consecutively to cases 2002-B-985 and 2002-C-1239. The [P]etitioner timely filed for appeal and the judgment was affirmed on appeal. . . . The [P]etitioner previously filed for error coram nobis relief on October 11, 2007, which was denied by the court in a written order while the case was pending on appeal. The current petition and hearing argued that a witness from the trial, Tammy Nelson, now asserts that she misidentified the [P]etitioner from his brother as one of the people she saw attack the victim in the case. At a hearing, the Court heard testimony from Tammy Nelson, former Detective Postiglione, and argument of counsel. The Court took the matter

11

under advisement and has consolidated the findings into this written memorandum.

Tammy Nelson testified that the Petitioner's mother recently called her and showed her a picture of the Petitioner's brother. Ms. Nelson looked at it and realized it was a picture of the person she saw the day of the murder, but that it was not the Petitioner. She stated that at the time of the offense, she had been doing cocaine and did not have a good memory of that time period or the trial. At the time she testified at trial, she was in jail on other charges. She was shown a copy of the affidavit submitted with this current petition, and although she acknowledged she signed something for the family of the [P]etitioner, she denied every saying she received a deal from the assistant district attorney in exchange for [her] testimony. She stated she did not remember the assistant district attorney from that time period, and did not recall having ever seen assistant district attorney Pam Anderson. She acknowledged she had been told in the past to keep her mouth shut regarding the case.

Pat Postiglione testified that he is currently employed as an investigator for the District Attorney's Office, but that he had previously been employed as a Metro Nashville police detective and conducted the investigation on this case prior to trial. He stated that during that investigation, Tammy Nelson identified the Petitioner on approximately six occasions. The [S]tate introduced photos of the Petitioner and of the brother that were contemporaneous with the investigation. The State also introduced a recording of Tammy Nelson's statement. Finally, the State introduced a report detailing the complaints that the Petitioner's mother had filed against Mr. Postiglione and the Metro Nashville Police Department.

. . . .

The issues raised by the Petitioner have been raised in prior proceedings. Since the time of the motion for a new trial, the Court has heard testimony regarding the Petitioner's innocence and the alleged guilt of his brother. The issues were ruled upon and reviewed on appeal. The Court finds the change in Ms. Nelson's testimony or identification is not newly discovered evidence. Ms. Nelson testified at trial and was cross-examined as to her identification of the Petitioner. The Detective in the case had interviewed Ms. Nelson regarding her identification. The Court does not find her change in testimony to be credible. She was approached by the family of the [P]etitioner, the statement was presented to her by that family and she acknowledged that portions within the signed statement are

not accurate. The Court finds that the Petitioner has not presented newly discovered evidence that would have resulted in a different judgment.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it denied his petition for writ of error coram nobis. He asserts that Ms. Nelson's testimony meets the standard for granting coram nobis relief based upon recanted testimony. The State counters that the coram nobis court correctly declined to grant the petition after expressing doubt about the veracity of the witness's testimony and finding that there was no reasonable basis to conclude that, had Ms. Nelson's recanting of her testimony been presented, that the result of the proceedings would be different.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. 40-26-105(a) (2014). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by this Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a writ of error coram nobis, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d)

the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id*. at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).

The Petitioner's petition for coram nobis relief is based on a claim of recanted testimony. Recanted testimony may be considered newly discovered evidence under certain circumstances. *See Mixon*, 983 S.W.2d at 672. This Court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *Mixon*, 983 S.W.2d at 673 n.17)

Inherent in the determination of whether a petitioner is entitled to relief based upon recanted testimony is the trial court's determination of whether the witness recanting his or her testimony is credible. A petitioner is not entitled to coram nobis relief based on recanted testimony unless the coram nobis court is reasonably satisfied that the prior testimony was false and the present testimony is true. *State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001).

In the case under submission, the trial court determined that Ms. Nelson's recanting of her trial testimony was not credible. It noted that Ms. Nelson was approached by the Petitioner's family, the statement was presented to her by that family, and she identified false portions within the signed statement. The duration between the time that Ms. Nelson had testified at trial and her recanted testimony was extensive. She had previously stated, shortly after the attack, that she had seen the attacker on several

occasions before the attack occurred. She then identified the Petitioner, on more than one occasion, as the man who had attacked the victim. Additionally, there was other evidence inculpating the Petitioner in this attack. Years later, after an extended period of drug use, Ms. Nelson then, after being approached by the Petitioner's mother, changed her mind about the identity of the attacker. The coram nobis court was able to see and hear Ms. Nelson's testimony at the trial and the evidentiary hearing and was in the best position to evaluate her credibility. "[A]ppellate courts do not reassess credibility determinations." *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009). In our view, the coram nobis court based its conclusion on a reasonable assessment of the evidence, and the Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we conclude that the coram nobis court did not err when it dismissed the Petitioner's petition for writ of error coram nobis.

_____

ROBERT W. WEDEMEYER, JUDGE